IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal Action No. 20-cr-40-01-CFC |
| | : | |
| | : | |
| NAHSIEM MCINTOSH | : | |
| a/k/a "Nahsiem Mcinosh," | : | |
| | : | |
| Defendant. | : | |

---

## <u>MEMORANDUM</u>

Pending before me are Defendant Nahsiem McIntosh's objections to two Sentencing Guidelines calculations in his Third Revised Presentence Report (PSR).

## I.   Background

At approximately 1:45 a.m. on May 31, 2020, McIntosh smashed the front glass door of the American Sportsman in Newark, Delaware, and entered the store with codefendant Derris Lloyd.  Codefendant Naushad Khan remained outside. McIntosh and Lloyd proceeded to break glass display cases from which they took handguns and grabbed larger firearms off the store's walls.  They left the store about two minutes later with as many guns as they could carry.  One of the guns Lloyd took from the store that night was an AR-15-style firearm capable of

accepting a magazine of more than 15 rounds of ammunition.  PSR, D.I. 162 ¶ 21;

D.I. 156 at 7; D.I. 183 at 18.

About two hours later—3:54 a.m., to be precise—another, unidentified man

entered the store, stealing additional firearms.  PSR ¶ 21.  During this second

burglary, codefendant Khan again was positioned outside the store, acting as a

lookout.  PSR ¶ 21.  At 4:04 a.m., two unidentified participants, including the

person who entered at 3:54 a.m., went back into the store and took more guns.

PSR ¶ 21.

The government has not adduced evidence and does not allege that McIntosh

was involved in, or had knowledge of, these latter two break-ins.  A total of 35

firearms, including two rifles and a shotgun, were stolen that day from the

American Sportsman.  PSR ¶ 21.  McIntosh and Lloyd stole roughly half of these

firearms.

On June 1, 2020, law enforcement agents pulled over a car in which

McIntosh was a passenger.  McIntosh immediately got out of the car and started

walking down an alleyway.  An agent followed him and arrested him after the

agent observed McIntosh throw a black grocery bag in a trash can.  The bag

contained a loaded 9mm semiautomatic pistol that had been stolen from the

American Sportsman on May 31st.  PSR ¶ 22–23.

2

## II.   The PSR Calculations and McIntosh's Objections

McIntosh pleaded guilty to aiding and abetting the theft of firearms from a federal firearms licensee in violation of 18 U.S.C. §§ 922(u) and 2, and possession of a firearm by a convicted felon in violation of §§ 922(g).  Because § 922(u) and § 922(g) are both indexed to U.S.S.G. § 2K2.1, *see* U.S.S.G. Appendix A, the PSR grouped those counts under § 3D1.2(d).  *See* PSR ¶¶ 38–51.  When counts are grouped together under § 3D1.2(d), "the court must group [the relevant] counts together and then calculate a single, combined offense level that will then be used to calculate the sentence for each count."  *United States v. Deckert*, 993 F.3d 399, 402–03 (5th Cir. 2021).

The PSR assigned McIntosh a base offense level of 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(B).  PSR ¶ 40.  It then increased the base offense by ten levels because of certain specific offenses characteristics.  PSR ¶¶ 41–50.  In this Memorandum, I address McIntosh's objections to the PSR's base offense level calculation and its application of a four-level enhancement under § 2K2.1(b)(6)(B) based on his possession of a firearm "in connection with another felony offense."

### A. Section 2K2.1(a)(4)(B)

McIntosh objects first to the PSR's application of § 2K2.1(a)(4)(B) to determine that his base offense level is 20. That section provides in relevant part that the base offense level for a firearm offense shall be 20 if:

> the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) firearm that is described in 26 U.S.C. § 5845(a); and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense . . . .

U.S.S.G. § 2K2.1(a)(4)(B). The PSR applied this section to McIntosh because McIntosh had a felony conviction at the time of the burglary and because Lloyd stole an AR-15-style firearm from the American Sportsman. The PSR determined that an AR-15-style firearm is a semiautomatic firearm capable of accepting a large capacity magazine based on Application Note 2 to § 2K2.1. That Application Note provides:

> For purposes of subsections (a)(1), (a)(3), and (a)(4), a ***"semiautomatic firearm that is capable of accepting a large capacity magazine"*** means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm. This definition does not include a semiautomatic firearm with an attached tubular device

4

> capable of operating only with .22 caliber rim fire
> ammunition.

U.S.S.G. § 2K2.1 cmt. n.2 (emphasis in the original).

As noted above, it is undisputed that the AR-15-style firearm stolen by Lloyd holds more than 15 rounds. It is also undisputed that McIntosh was a convicted felon at the time of the burglary. McIntosh nonetheless argues that § 2K2.1(a)(4)(B) does not apply here.

McIntosh initially objected to the PSR's application of § 2K2.1(a)(4)(B) on the ground that "Mr. Lloyd, not Mr. McIntosh, stole the firearm capable of accepting a large capacity magazine." D.I. 156 at 7. This objection, however, cannot be sustained, as McIntosh pleaded guilty to aiding and abetting the theft of firearms from a federal firearms licensee; and, in any event, under U.S.S.G. § 1B1.3(a)(1)(A), a defendant's base offense level "shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[.]" It is undisputed that McIntosh aided and abetted Lloyd's theft of firearms from the American Sportsman.

McIntosh argued in "supplemental objections" that he filed on the eve of the initial sentencing hearing that § 2K2.1(a)(4)(B) should not apply to him "because its application is premised on commentary to which the Court owes no deference

5

under" *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). D.I. 163 at 1. In McIntosh's words, "the commentary's bright line 'more than 15 rounds' rule for determining what constitutes a 'large capacity magazine' fails *Kisor*'s framework. . . . If the Commission wanted courts to apply this enhancement based on this bright line rule, it should have adopted it through notice and comment rulemaking." D.I. 163 at 3, 6.

In *Kisor*, the Supreme Court "cut back on what had been understood to be uncritical and broad deference to agency interpretations of regulations and explained that *Auer* [*v. Robbins*, 519 U.S. 452 (1997)] . . . deference should only be applied when a regulation is genuinely ambiguous." *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc). Before *Kisor*, under the so-called "*Stinson* paradigm" (named after *Stinson v. United States*, 508 U.S. 36 (1993)), courts were "required . . . to defer to the Commission's commentary for a [g]uideline unless that interpretation was plainly erroneous or inconsistent with the [g]uideline." *United States v. Adair*, 38 F.4th 341, 348 (3d Cir. 2022). In *Adair*, the Third Circuit held that after *Kisor*, "[a]lthough the *Stinson* paradigm has not changed," "before affording controlling deference to [the Sentencing Commission's] interpretation of a genuinely ambiguous [guideline], a court must make an 'independent inquiry' into the 'character and context' of the reasonable

6

interpretations of the [guideline], *i.e.*, those within the 'zone of ambiguity.'" *Id.*

(quoting *Kisor*, 139 S. Ct. at 2416). In the words of *Adair*, "[i]n sum, under *Kisor*,

a genuine ambiguity in an agency's regulation is necessary for *Auer* deference, but

it is not sufficient: the character and context of an agency interpretation that falls

within the regulation's zone of ambiguity must also counsel in favor of deference."

*Id.* at 349. And, according to *Adair*, "[a]s guideposts" to determine the character

and context in question,

> the Supreme Court identified [in *Kisor*] three character-
> and-context circumstances in which an agency's
> otherwise reasonable interpretation should not receive
> controlling weight.  Those occur when an agency's
> interpretation is not its "'authoritative' or 'official
> position,'" when the agency's interpretation does not
> implicate its "substantive expertise" in some way, and
> when the agency's reading does not reflect its "fair and
> considered judgment" but rather is a "convenient
> litigating position," a "*post hoc* rationalization," or a
> parroting of a federal statute . . . .

*Id.* at 348–49 (citations omitted).

McIntosh and the government agree that the term "large capacity magazine"

in § 2K2.1 is ambiguous. *See* D.I. 185 at 4 (Defendant stating in his Supplemental

Reply Brief that "[t]he parties agree that the phrase ['large capacity magazine'] is

ambiguous."). It is also undisputed that Application Note 2 constitutes the

Sentencing Commission's official position and is neither a litigation position nor a

"post hoc rationalization" or parroting of a federal statute.  McIntosh argues, however, that Application Note 2 is unreasonable and should not receive controlling weight because its "number-setting . . . falls outside of the Commission's expertise, constitutes a legislative rule, and is no longer reflective of the reality of firearm and ammunition industry standards, and therefore does not reflect its 'fair and considered judgment.'"  D.I. 183 at 17 (citation omitted).

As an initial matter, I agree with the government that Application Note 2's interpretation of the ambiguous phrase "large capacity magazine" to mean "magazine or similar device that could accept more than 15 rounds of ammunition" is reasonable.  Fourteen states and the District of Columbia have large capacity magazine restrictions.  Although these jurisdictions have different thresholds for the number of rounds in a large capacity magazine, their thresholds range between ten and 17.  Sixteen rounds falls within that range and therefore, in my view, cannot be fairly characterized as unreasonable.

McIntosh's second contention—that "number-setting . . . falls outside of the Commission's expertise"—is easily rejected.  Setting the number of rounds for determining a sentencing guideline range is a sentencing matter.  It therefore falls squarely within the Commission's "data-driven expertise."  *Cf. Adair*, 38 F.4th at

360 (refusing to apply deference in part "because the Commission did not invoke its data-driven expertise on criminal sentencing").

McIntosh next argues that setting a numeric threshold of rounds to define a large capacity magazine constitutes unlawful legislative rulemaking. According to McIntosh, "legislative rules must proceed through notice-and-comment rulemaking, while interpretive rules need not," D.I. 183 at 13, and "[i]f the Commission wanted courts to apply this enhancement based on this bright line rule, it should have adopted it through notice and comment rulemaking," D.I. 183 at 14. In point of fact, although a notice-and-comment process may not have been required to issue Application Note 2, *cf.* 28 U.S.C. § 994(x) ("The provisions of section 553 of title 5, relating to publication in the Federal Register and public hearing procedure, shall apply to the promulgation of guidelines pursuant to this section."), Application Note 2 was adopted through a notice-and-comment process, *see* 71 Fed. Reg. 4782, 4782–4804 (proposed Jan. 27, 2006); 71 Fed. Reg. 28063, 28063–73 (May 15, 2006). But in any event, the fact that the application note contains a numeric value does not prevent it from being an interpretive, as opposed to legislative, rule. *Cf. Warshauer v. Solis*, 577 F.3d 1330, 1340 (11th Cir. 2009).

McIntosh says "[t]he Sixth Circuit's opinion in *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021), proves instructive." D.I. 163 at 3. But his reliance

9

on *Riccardi* is misplaced.  Riccardi was convicted of stealing 1,505 gift cards.  The actual value of the average stolen card was about $35, and thus the total actual value of the cards Riccardi stole was around $47,000.  *Riccardi*, 989 F.3d at 479. Instead of proving the total loss of Riccardi's theft under § 2B1.1 of the Guidelines by adding up the actual values of the cards Riccardi had stolen, the government elected to rely on commentary to § 2B1.1 that provided that the loss "'shall be not less than $500' for each 'unauthorized access device,' a phrase that Riccardi concede[d] cover[ed] stolen gift cards." *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.3(F)(i)).  The district court allowed the government to proceed this way, applied the commentary in question, and found that Riccardi's total loss amount under § 2B1.1 was $752,500.  On appeal, the Sixth Circuit concluded that a mandatory minimum loss amount untethered to the actual loss at issue in the case was an "improper expansion" of the guideline's text and not a reasonable interpretation of the word "loss." *Id.* at 480.  This conclusion makes sense, as no reasonable person would attribute a loss amount of $500 to a stolen card that had an actual value of $35.

*Riccardi* has no bearing here.  Application Note 2 does not substitute in place of the actual number of rounds in a magazine a posited number of rounds. Indeed, it provides no guidance about how to calculate the number of rounds in a

magazine.  It merely quantifies an ambiguous relative term ("large") that can only be meaningfully (and uniformly) applied if it is interpreted in quantifiable terms. Application Note 2 is thus paradigmatically "interpretive."

McIntosh says that Application Note 2 "create[s] a bright line rule that impermissibly expands the guidelines through commentary."  D.I. 185 at 4–5.  But Application Note 2 is better read as limiting, not expanding, § 2K2.1.  It limits the guideline in three ways.  First, it sets a floor for the number of rounds in the magazine.  Second, it restricts application of the guideline to cases where the magazine is attached to the firearm or in close proximity to it.  And third, it exempts from the guideline's scope tubular magazines that hold only .22 caliber ammunition.

Finally, McIntosh argues that characterizing a magazine with 16 rounds as "large" "is no longer reflective of the reality of firearm and ammunition industry standards, and therefore does not reflect . . . 'fair and considered judgment.'"  D.I. 183 at 17 (quoting *Kisor*, 139 S. Ct. at 2417–18).  According to McIntosh, Application Note 2 is unreasonable because gun manufacturers have increased significantly their offerings of semi-automatic pistols with magazines of more than 15 rounds since the time the Application Note was promulgated in 2006.  In McIntosh's words, "Based on the firearm industry's current standards, 16 rounds is

not 'large' in today's world." D.I. 183 at 10. But the fact that there are more large

capacity firearms in the world today than there were in 2006 has no bearing on the

reasonableness of enhancing a defendant's sentence for engaging in criminal

activity that involves a firearm with a large capacity magazine. Everything else

being equal, a criminal is more dangerous if he has a firearm with a large as

opposed to a small capacity magazine. He can shoot more people more quickly

and inflict more injury with the former than he can with the latter. The fact that

large capacity magazines are becoming more prevalent does not change that

reality.

In sum, Application Note 2 is a reasonable interpretation of § 2K2.1 that

may be applied under *Kisor*. Accordingly, I will overrule McIntosh's objection to

its application in this case.

### B. Section 2K2.1(b)(6)(B)

McIntosh next objects to the PSR's application of a four-level enhancement

under § 2K2.1(b)(6)(B) for "possess[ing] a firearm in connection with another

felony offense." The Presentence Officer deemed the "other felony offense" in this

case to be the burglary of the American Sportsman, and he based his decision to

apply the four-level enhancement on Application Note 14(B), which provides in

relevant part that § 2K2.1(b)(6)(B) "appl[ies] . . . in a case in which a defendant

who, during the course of a burglary, finds and takes a firearm, even if the

defendant did not engage in any other conduct with that firearm during the course

of the burglary[.]"

McIntosh does not (and could not reasonably) dispute that his unlawful entry

into and theft of firearms from the American Sportsman constituted felony

burglary under Delaware law.  *See* D.I. 198 at 7; *see also* 11 Del. C. § 824 ("A

person is guilty of [felony] burglary in the third degree when the person knowingly

enters or remains unlawfully in a building with intent to commit a crime therein.").

But he argues that Application Note 14(B) is entitled to no deference under *Kisor*

for two reasons: first, because "another felony offense" is an unambiguous term

that does not include a burglary committed contemporaneously with the federal

offense of aiding and abetting the theft of firearms from a federal firearms licensee,

D.I. 177 at 1–2; and second, because the application note is not reasonable, D.I.

185 at 1.

McIntosh cites in support of his first argument *United States v. Fenton*, 309

F.3d 825 (3d Cir. 2002), a case decided before the Sentencing Commission

adopted Application Note 14(B) in 2006.  The Court in *Fenton*, over a dissent by

Judge Roth, stated that "we do not think that the phrase 'another felony offense' is

open to two readings," 309 F.3d at 828 n.3, and "[i]t is only intuitive . . . that the

13

phrase 'another felony offense' [for § 2K2.1 purposes] requires a distinction in time or conduct from the offense of conviction." *Id.* at 828. Based on this understanding of "another felony offense," the Court held in *Fenton* that when the same felonious conduct violates both a federal weapons law and a state burglary law, the burglary does not count as "another felony offense" under the guideline provision now codified at § 2K2.1(b)(6). (The provision in question was codified at § 2K2.1(b)(5) when *Fenton* was decided.)

*Fenton*'s distinct-in-time-or-conduct rule, however, has been abrogated. As the Third Circuit held nine years later in *United States v. Keller*, "the rule we stated in *Fenton* . . . is no longer valid to the extent it was applied to the burglary and drug trafficking offenses referenced in Application Note 14(B)." 666 F.3d 103, 108 (3d Cir. 2011). In *Keller*, the Court ruled that a district court "erred procedurally when it relied on *Fenton*" and refused to apply § 2K2.1(b)(6)'s "another felony enhancement" against a defendant who, like McIntosh, was convicted of § 922(u). *Id.* at 109. Although it is true, as McIntosh notes, that *Keller* was decided pre-*Kisor* and under the *Stinson* framework, the unanimous Court in *Keller* based its decision on its findings that (1) "[t]he meaning of USSG § 2K2.1(b)(6) is ambiguous in cases where the purported other felony is very closely related to the firearms offense," and (2) Application Note 14(B) "resolved

14

that ambiguity with respect to cases, like th[e] case [in *Keller*] and *Fenton,* in which a burglary is committed for the purpose of obtaining firearms." *Id.* These findings and the competing views of Judge Roth and the majority opinions in *Keller* and *Fenton* all point to what to me seems obvious—reasonable minds can disagree about whether the phrase "another felony offense" includes only an offense that is distinct in time and conduct from the underlying offense or can include a state offense not distinct in time or conduct. Allowing for divergent, reasonable interpretations of a phrase is the epitome of legal ambiguity. Accordingly, I reject McIntosh's contention that "another felony offense" in § 2K2.1 is unambiguous.

McIntosh's second argument—that even if § 2K2.1 is not ambiguous, Application Note 14(B) is not entitled to deference under *Kisor* because it is unreasonable—also fails. According to McIntosh: "Applying the enhancement to an individual who possesses a firearm because he stole it during a burglary punishes the individual for mere possession of the firearm—the possession is coextensive with the burglary." D.I. 185 at 3. But § 922(g) and § 922(u) are neither coextensive with each other nor with 11 Del. C. § 824; and all three statutes address different circumstances and threats. Section 922(g) makes it a crime for certain individuals—including convicted felons—to possess a firearm. Its purpose

15

is "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Section 922(u) is aimed at protecting federally licensed firearms dealers from theft. It makes it unlawful "to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(u).  Section 824, by contrast, is aimed at punishing and deterring unlawful entries into buildings to commit crimes.  Neither § 922(g) nor § 922(u) require entry into a building.  Thus, contrary to McIntosh's assertions, Application Note 14(B), at least as applied here, does not "punish[ ] [him] for mere possession of [a] firearm." D.I. 185 at 3.  Nor does it punish him for mere theft from a federally licensed firearms dealer.  Accordingly, Application Note 14(B) is not unreasonable; and I will overrule McIntosh's objection to its application in this case.

### III. Conclusion

For the foregoing reasons, I will overrule McIntosh's objections to the PSR's calculation of his base offense level under § 2K2.1(a)(4)(B) and its

application of a four-level enhancement under § 2K2.1(b)(6)(B).

April 25, 2023

_____
CHIEF JUDGE